**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, CHIEF JUDGE**

Civil Case No.  02-cv-00796-LTB-PAC

PHELPS DODGE CORPORATION and
MT. EMMONS MINING COMPANY,

       Plaintiffs,

v.

U.S. ENERGY CORPORATION and
CRESTED CORPORATION,

       Defendants,

and

U.S. ENERGY CORP. and
CRESTED CORP.,

       Third Party Plaintiffs,

v.

CYPRUS AMAX MINERALS COMPANY, a Delaware corporation,

       Third Party Defendant.

_____

**Order**

_____

       Plaintiffs Phelps Dodge Corporation and Mt. Emmons Mining Company ("Phelps Dodge")

seek attorney fees and costs after prevailing in a declaratory judgment action against defendants

U.S. Energy Corporation and Crested Corporation ("USE/CC") regarding the parties' rights

under a real estate agreement. An evidentiary hearing was held on July 20, 2006. For the reasons

stated below, Phelps Dodge's  motion is GRANTED in part, and DENIED, in part.

# I. BACKGROUND

The underlying dispute in this case concerns a conflict between Phelps Dodge and USE/CC regarding the transfer of mining properties outside of Crested Butte, Colorado. The mine and the area surrounding it are referred to by the parties as the Mt. Emmons Properties. Located on the properties is a Water Treatment Plant ("WTP"). The dispute between the parties is governed by contracts finalized in 1987: the 1987 Master Agreement and the Amended and Restated Royalty Deeds ("Amended Royalty Deeds") together referred to as "the 1987 Agreements."

Section 8 of the Amended Royalty Deeds provides that Phelps Dodge may transfer the Mt. Emmons Properties to USE/CC with six months notice. On November 14, 2001 Phelps Dodge exercised this right and notified USE/CC of their intention to transfer the properties. USE/CC  responded on June 14, 2002 that it would not accept the properties unless the WTP was severed and not part of the transfer.

Phelps Dodge filed suit on June 17, 2002 seeking a declaratory judgment on two issues that are relevant to the present motion: 1) whether the WTP transferred with the properties from Phelps Dodge to USE/CC under their 1987 Agreements, and 2) whether under section 7(b) of the Amended Royalty Deeds Phelps Dodge owed USE/CC any advance royalty payments. After a four day bench trial November 29, 2004 to December 2, 2004, I issued Findings of Fact and Conclusions of Law on February 4, 2005, ("the February 2005 Order") determining that the WTP transferred to USE/CC with the property and that Phelps Dodge did not owe any additional advance royalties to USE/CC.

Phelps Dodge now seeks $3,339,949.05 in attorney fees and costs incurred in litigating

2

this action, as well as $4,315,293.45 in expenses incurred to operate and protect the Mt. Emmons

Property during the time Phelps Dodge claims that USE/CC was legally responsible for these

operations. USE/CC challenges Phelps Dodge's entitlement to attorney fees, and argues that the

amount Phelps Dodge seeks is unreasonable.

## II.  DISCUSSION

Phelps Dodge argues it is entitled to attorney fees and costs under the 1987 Agreements

and the Declaratory Judgment Act, 28 U.S.C. § 2202. I will address both of these theories of

recovery.

A.      Attorney Fees under 1987 Master Agreement

Phelps Dodge seeks attorney fees first under the 1987 Master Agreement. Section 13.05

of the Agreement states in relevant part:

> "If a breach of any . . . obligation of any party is discovered or occurs
> after the Closing, any other party shall be entitled to recover from
> the party responsible for the breach damages (including reasonable
> attorneys' fees and expenses) which may be shown to have been
> caused by such breach and to obtain such other equitable relief as
> may be appropriate under the circumstances."

The first issue is whether Phelps Dodge's victory in a declaratory judgment action in

relation to this provision entitles it to attorney fees. Phelps Dodge contends that Colorado courts

treat contractual attorney fee provisions as similar to statutory fee-shifting statutes, allowing the

prevailing party to obtain attorney fees. *Brock v. Weidner,* 93 P.3d 576, 579 (Colo. Ct. App.

2004). Since Phelps Dodge prevailed on the two declaratory judgment claims at issue in this phase

of the dispute, it is a prevailing party and thus entitled to attorney fees.

The flaw in this argument is that this contract language does not award attorney fees to

3

prevailing parties, but to the non-breaching party in the event of a breach. USE/CC points out, correctly, that while this Court has rendered a declaratory judgment for Phelps Dodge, it has not found that USE/CC engaged in a breach of contract. Since Colorado Courts construe contractual fee provisions narrowly, *Public Service Co. of Colorado v. Continental Cas. Co.,* 26 F.3d 1508, 1522-1523 (10th Cir. 1994), *see also Allison v. Bank One-Denver*, 289 F.3d 1223, 1244-45 (10th Cir. 2002), Phelps Dodge cannot recover under this provision of the 1987 Agreements. This same logic defeats Phelps Dodge's argument that Colorado courts award fees to winners in declaratory judgment actions. Since the Agreement provides the only basis for recovering fees here, whether Colorado courts in general allow fees in declaratory judgment actions is irrelevant.

Phelps Dodge makes two arguments as to why this narrow language does not prevent its recovery. First, it argues that USE/CC has engaged in anticipatory breach. An anticipatory breach occurs when a party states a "definite and unequivocal" intention to "not render the promised performance" at the time the contract prescribes for performance. *Johnson v. Benson,* 725 P.2d 21, 25 (Colo. Ct. App. 1986) [citing Restatement (Second) of Contracts § 250 cmt. b (1981)]. This repudiation must be a "present, positive unequivocal refusal to perform the contract, not a mere threat to abandon its obligations under the contract." *Lake Durango Water Co., Inc. v. Public Utilities Commission of the State of Colorado,* 67 P.3d 12, 21 (Colo. 2003).

It is undisputed that Phelps Dodge in 2001 tried to exercise its rights under the Agreements to transfer the property, and that USE/CC stated that it was not "ready, willing or able" to accept the transfer "as long as it entails an obligation to operate the plant."(Exhibit 4, Joint Trial Exhibit 270, page 2.)  Phelps Dodge contends that USE/CC's willful failure to carry out its commitments under the Agreements constitutes anticipatory breach because it was

"present, positive and unequivocal."

USE/CC does not contest the facts underlying Phelps Dodge's theory of anticipatory breach. Rather, USE/CC argues that its actions were "erroneous" but "made in good faith" and so are not breach. *Walker v. Shasta Minerals & Chemical Co.,* 352 F.2d 634, 638 (10th Cir. 1965). USE/CC supports this argument by pointing to language in the February 2005 Order stating that the wording of the 1987 Agreements was ambiguous, and pointing out that the Court questioned whether there was a meeting of the minds of the parties as to the meaning of this provision. In this light, the mere fact of USE/CC's unwillingness to accept Phelps Dodge's reading of the contract is not breach.

This argument is unpersuasive. The February 2005 Order states clearly that "at the time that the 1987 Agreements were entered, all parties understood that the Water Treatment Plant would transfer with the Properties pursuant to Paragraph 8 of the Amended Royalty Deeds." (Page 27.) The February 2005 Order also states that the USE/CC witnesses who testified that they believed that the Agreements did not require transfer of the Water Treatment Plant "lacked credibility." These findings undermine USE/CC's claim that it acted in good faith when it refused to accept the property with the Water Treatment Plant.

USE/CC makes other arguments against Phelps Dodge's theory of recovery, some stronger than others. USE/CC contends that Phelps Dodge has failed to satisfy two conditions precedent for breach: tendering the quit-claim deed and providing written notice of default, as required by the Agreements. However, this argument simply begs the question, since if USE/CC breached they may not rely on other provisions of the Agreement, *Lake Durango,* 67 P.3d at 21**,** and if they did not breach there is no need to rely on these provisions.

USE/CC's strongest argument concerns the procedural posture of this case. Phelps Dodge is claiming a breach of the agreement for the first time in this post-trial motion for attorney fees. This raises at least two hurdles for Phelps Dodge. First, breach of contract is generally a question of fact, and the February 2005 Order did not make any fact findings specifically related to anticipatory breach. This is not fatal to Phelps Dodge, however, since the findings of fact on the record are sufficient to show anticipatory breach. It is undisputed that USE/CC in its June 14, 2002 letter, knowingly and purposefully refused to accept the Mt. Emmons Properties with the WTP, and the Findings of Fact in the February 2005 Order state that the parties reached a meeting of the minds in 1987 that the WTP would transfer with the properties. These two undisputed facts, combined, satisfy the elements of anticipatory breach.

Similarly, Phelps Dodge's failure to plead specifically breach of contract does not bar its claim for attorney fees. A complaint is sufficient if it gives defendants "fair notice of what the claim is and the grounds on which it rests." *Lone Star Industries, Inc. v. Horman Family Trust,* 960 F.2d 917, 922 (10th Cir. 1992.) "The dimensions of a lawsuit are not determined by the pleadings" and "recovery may be had on grounds not asserted in the complaint." *Harbin v. Assurance Co. of America,* 308 F.2d 748, 750 (10th Cir. 1962). While USE/CC argued at the Hearing that the pleadings did not give them notice of a claim for breach, USE/CC's 13th Affirmative Defense to the complaint was absence of a duty and no breach of duty. Recognizing that the purpose of pleading is to "facilitate a proper decision on the merits," *Conley v. Gibson,* 355 U.S. 41, 48 (1957), and heeding the requirement of Fed. R. Civ. P. 8(f) that "all pleadings shall be so construed as to do substantial justice," I find that Phelps Dodge's complaint placed USE/CC sufficiently on notice to allow a claim for anticipatory breach.

However, Phelps Dodge faces another more serious hurdle. A finding of breach is not, by itself, sufficient to collect attorney fees and costs. Section 13.05 of the 1987 Agreements allow the non-breaching party to collect damages "which may be shown to have been caused by such breach." The fact findings on the record are silent on the question of damages, and so are insufficient to justify attorney fees even if Phelps Dodge's claim for breach is valid.

Phelps Dodge tries to rescue its claim by bringing in evidence of damages in its post-trial motion. Phelps Dodge contends that attorney fees are a matter collateral to the underlying action and so may be argued in a post-trial motion containing additional facts. Phelps Dodge's authority for this argument, however, addresses attorney fees under prevailing party contract language, *Roberts v. Adams,* 47 P.3d 690, 698 (Colo. Ct. Ap.. 2001), and whether a judgment is final for purposes of an appeal. *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 199-200 (1988). The attorney fees claim here, conversely, is directly tied to the claim for breach, and so is "inseparable from the merits of plaintiffs' claim" and not collateral. *See Lampkin v. International Union (UAW),*154 F.3d 1136, 1141 (10th Cir. 1998). While *Budinich* attempts to establish a categorical rule that claims for attorney fees are collateral, *Budinich,* 486 U.S. at 202, *Lampkin* states clearly that this rule does not apply where the claim for attorney fees is part of the underlying claim. *Lampkin*, 154 F.3d at 1141.

More applicable to this case is *Carolina Power & Light v. Dynegy Marketing & Trade,* 415 F.3d 354, 359 (4th Cir. 2005), where the Fourth Circuit analyzed a contract provision similar to the one here and concluded that it was part of the damage award and thus a component of the underlying claim. The court applied Fed. R. Civ. Pro. 54(d)(2)(A), which states that "Claims for attorneys' fees and related non-taxable expenses shall be made by motion unless the substantive

law governing the action provides for the recovery of such fees as an element of damages to be proved at trial." *Id.* at 358-359. Here, the language of the Agreements controls the substantive law governing this action. Since a showing of breach and damages is necessary to collect attorney fees, it is "inseparable from the merits," and not a collateral claim. Breach and damages must therefore be proven at trial, not in a post-trial motion.

This is fatal to Phelps Dodge's claim. Phelps Dodge must rely on the fact findings as they are to prove every element necessary to collect attorney fees under the Agreements. While a liberal interpretation of the rules of civil procedure allows a claim for breach, and the fact findings on the record support a finding of breach, the record as it stands does not show damages, so Phelps Dodge cannot recover attorney fees under the Agreements.

B.      Attorney Fees Under Declaratory Judgment Act 28 U.S.C. § 2202

In the alternative, Phelps Dodge seeks a finding that USE/CC engaged in anticipatory breach and an award of attorney fees and costs under the Declaratory Judgment Act, 28 U.S.C. § 2202. Section 2202 allows a district court to grant "further necessary or proper relief" to a party whose rights have been determined by a declaratory judgment, after "reasonable notice and hearing."

Citing *Gant v. Grand Lodge of Texas,* 12 F.3d 998, 1002 (10th Cir. 1993), Phelps Dodge contends that § 2202 allows a Court to award damages in the form of attorney fees. This kind of additional relief is available under § 2202 even if it was neither demanded nor proved in the original declaratory judgment action. *Id.* Further, "Any additional facts that may be necessary to support the award of further relief can be proved on the hearing provided for by the statute." *Id.* *See also* 10B. C. Wright, A. Miller & C. Kane, *Federal Practice & Procedure*, §2771, at 682 (3d

8

ed. 1998).

USE/CC responds that an award of attorney fees under the § 2202 is only appropriate when there is a close link between the declaratory judgment and the award of fees. Citing *Patton v. Denver Post Corp.*, 379 F. Supp.2d 1114 (D. Colo. 2005), defendants argue that "§ 2202 cannot reasonably be read to authorize (attorney fees) to a litigant solely on the grounds that she is a prevailing party." *Id.* at 1116.   Rather, an award of attorney fees is only "necessary or proper" where it is "somehow necessary to effectuate the relief that has already been granted" in the declaration of rights. *Id.*   The District Court in *Patton* distinguished *Gant,* reasoning that awarding attorney fees there was necessary to effectuate the declaratory judgment, which was a trust beneficiary's right to receive an adequate income under a disputed will. *Gant*, 12 F.3d at 1002. Absent an award of attorney fees, the beneficiary would have paid her fees and costs from the income provided under the will, thus denying her an "adequate living" and  directly undermining the declaratory judgment. *Patton,* 379 F.Supp.2d at 1117.

I cannot agree with USE/CC that relief under § 2202 must meet a more stringent test than that which is  "necessary and proper" to carry out the declaratory judgment. This is the plain language of the statute, and the law of the Tenth Circuit.  *Security Insurance Co. of New Haven v. White,* 236 F. 2d 215, 220 (10th Cir. 1956). In *Security Insurance* an insurance company lost a declaratory judgment concerning its obligation to defend a policy holder against a lawsuit. The court awarded attorney fees to the estate of the policy holder, both for the costs of defending the underlying lawsuit and for the costs incurred defending the declaratory judgment action. *Id.* at 218, 220. The link between attorney fees and the previous declaratory judgment action is virtually identical to that between the two actions here.

9

Even more on point is *Horn & Hardart Co., v. National Rail Passenger Corporation,* 843 F.2d 546 (D.C. Cir. 1988), where the defendant won a declaratory judgment interpreting a disputed leasehold agreement providing damages, including attorney fees, in the event of a default. *Id.* at 547 n2. The Court found that the defendant's request for attorney fees "follows absolutely from, and is based on" the declaratory judgment it won regarding its rights under the lease. *Id.* at 548. The Court added, significantly: "And even though (defendant's) present request may not be 'necessary' to effectuate the lease termination ruling, the plain language of the Declaratory Judgment Act does not require this level of stringency. The relief need only be proper." *Id.*

Under this authority, Phelps Dodge's request is valid. Phelps Dodge need only show that attorney fees are a proper form of relief. The nexus here between the declaration of the rights of the parties under the Agreements and an award of attorney fees is legally indistinguishable from that in *Horn & Hardart,* and very similar to the award of fees in *Security Insurance.* Unlike a claim for attorney fees under the Agreements, in a claim for attorney fees under § 2202, Phelps Dodge may provide additional evidence in a post-trial hearing. *Gant,* 12 F.3d at 1002.

Based on this analysis, I conclude that attorney fees are proper under § 2202. USE/CC does not seriously contest the substance of Phelps Dodge claim of anticipatory breach, except to argue that it acted in good faith, an argument I rejected above. USE/CC also does not seriously contest that its failure to accept the WTP caused the lawsuit, which in turn caused Phelps Dodge to incur fees and costs. Therefore, as further relief to Phelps Dodge under § 2202, I find and conclude that USE/CC's refusal to accept the WTP as part of the transfer of the Mt. Emmons Properties was anticipatory breach of the Agreement. I also find and conclude that this breach

caused Phelps Dodge to incur attorney fees and costs and the expenses of operating the MEP, and

that awarding reasonable attorney fees, costs and expenses under § 2202 is necessary and proper

to effectuate Phelps Dodge's relief.

C.    Recovery of the Costs of Operating the Water Treatment Plant

USE/CC also argues that Phelps Dodge cannot recover the costs of operating the WTP

because Phelps Dodge has not quit-claimed the property to USE/CC which, according to the

Amended Royalty Deeds, is a precondition to transfer and that until transfer Phelps Dodge is

responsible for the costs of the MEP. This argument is to say the least, curious. It was USE/CC's

refusal to accept the property with the WTP that sparked this litigation. The parties argued this

issue, and USE/CC lost. For USE/CC to argue now, after refusing to accept the property

according to the 1987 Agreements, that Phelps Dodge cannot recover costs because they did not

transfer the property is, to be kind, disingenuous.

USE/CC appears to also contend that Phelps Dodge cannot recover expenses because

they did not convey the property immediately after the declaratory judgment was issued.

However, the record shows that this issue was negotiated between the parties for several months,

and that the property was quit-claimed to USE/CC as of February 28, 2006. This argument, if it

ever had merit, now appears to be moot.

Finally, USE/CC argues that even if Phelps Dodge is entitled to these expenses, it is only

entitled to the MEP expenses until February of 2005, when I issued the February 2005 Order.

USE/CC claims that it was prepared to take the property at that point, and it should not be

charged for operating expenses incurred while both parties were negotiating the details of the

transfer. Phelps Dodge argues, and the record supports, that it was not until August 24, 2005 that

11

the parties resolved the outstanding issues necessary to complete the transfer. (See Joint Status Report for September 2005, Docket # 357.) Phelps Dodge contends that had USE/CC not refused to accept the transfer after the November 14, 2001 six-month notice letter, these issues would have been resolved then. It was therefore USE/CC's refusal that created the necessity for months of negotiating to resolve these issues. I agree. Phelps Dodge should not have to bear these costs and they are appropriately billed to USE/CC. I note that these expenses do not include those incurred from September of 2005 to February of 2006, when the property was actually transferred by quitclaim deed.

D.      The Reasonableness of Phelps Dodge's Claims for Fees and Costs

        USE/CC challenges on numerous grounds the reasonableness of Phelps Dodge's request for attorney fees and costs. Based on the July 20, 2006 Hearing, Phelps Dodge claims $3,339,949.05 in attorney fees and costs for this case. Phelps Dodge also claims $4,315,293.45 in expenses for operating the MEP from July of 2002 to August of 2005. These figures differ from those in the Amended and Restated Motion for attorney fees. First, the figure for attorney fees at the July 20, 2006 hearing appears to include $36,032.11 in attorney fees identified in the invoices as for "operational expenses" related to the MEP that were not included in the Amended motion. As will be explained below, this money can be claimed either as an MEP operating expense or as attorney fees, provided that it is not counted twice. Second, Phelps Dodge at the Hearing claimed about $157,000 less in MEP operating expenses than it claimed in the Amended Motion, largely because the claim in the Amended Motion includes costs for September 2005, while the figure requested at the July 20, 2006 hearing did not. For the purposes of this motion, all adjustments to the request described below are adjustments from the figures requested at the July 20, 2006

12

hearing, not from those in the Amended Motion.

Since I have already concluded that Phelps Dodge's entitlement to attorney fees derives not from the 1987 Agreements but from the Declaratory Judgment Act, I analyze the reasonable attorney fees under the standards that apply to fee-shifting statutes, not the less stringent standard that applies to contracts.

In deciding what constitutes reasonable attorney fees, I must apply the lodestar principles stated in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983). Under this analysis, I determine the number of actual hours expended on the case, hours reasonably expended, and a reasonable hourly rate. The latter two elements are multiplied together to establish the "lodestar." "Once an applicant for a fee has carried the burden of showing that the claimed rate and number of hours are reasonable, the resulting fee is presumed to be a reasonable fee." *Robinson v. City of Edmond,* 160 F.3d 1275, 1281 (10th Cir. 1998). The determination of the reasonableness of attorney fees is a question of fact for the trial court and will not be disturbed on appeal unless patently erroneous and unsupported by the evidence. *See Hartman v. Freedman*, 591 P.2d 1318, 1320 (Colo. 1979).

1.     Hourly Rates

The primary attorneys for Phelps Dodge in this litigation were Robert Pohlman, Cynthia Chandley, Brian Nazarenus and Richard Kauffman. Pohlman is a shareholder at Ryley, Carlock and Applewhite ("RCA") with more than 30 years experience in complex litigation. According to his affidavit his usual rate is $395/hour, but his rate for this litigation ranged from $250-$350/hour. Chandley is also an RCA shareholder, with about 16 years experience. Her usual rate is $270/hour, and for this case she charged from $220-$270/hour. Nazarenus is a shareholder with

RCA and a former partner at Friedlob, Sanderson, Paulson & Tourtillot ("FSPT"), where he was the principal attorney representing Phelps Dodge in this case. Nazarenus has been practicing law since 1987, his normal billing rate is $265/hour, and he billed in this case at $240/hour. Kauffman was of counsel at FSPT, and has been practicing law since 1977. His standard billing rate is $235 an hour, which he charged in this case. Phelps Dodge also provides an affidavit from Patricia Davis, a paralegal with 27 years experience, who customarily bills at $140/hour and in this case billed at $120-$140/hour.

A district court should base hourly rates on the prevailing market rates in the area for comparable litigation. *Case v Unified School District No. 233 Johnson County,* 157 F.3d 1243, 1255-1256 (10th Cir. 1998). At the evidentiary hearing, Phelps Dodge offered the testimony of Richard Caschette, an attorney with 27 years of experience, mainly in the Denver area, as to the reasonableness of the fees and expenses in this case. Caschette testified that he has not previously worked for Phelps Dodge. Caschette stated that the rates charged by Phelps Dodge's attorneys were reasonable for this area. Based on this testimony, and relying on my own knowledge of prevailing market rates, I find that the rates claimed by the Phelps Dodge attorneys are reasonable.

      2.      Number of Hours

In a fee-shifting statute, "The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Attorneys seeking fees must submit "meticulous contemporaneous time records that reveal . . . all hours for which compensation is requested and how those hours were allotted to specific tasks." *Case,* 157 F.3d at 1250. A district court must

14

also ensure that the attorneys have exercised "billing judgment;" which consists of "winnowing the hours actually expended down to the hours reasonably expended, omitting hours not reasonably billed to the client. *Id.*

After ensuring that each task is properly chargeable, the court must examine the hours allocated to each task to ensure that these are reasonable. *Id.*   In assessing the reasonableness of hours devoted to any given task, or to the litigation as a whole, the court should consider "the complexity of the case, the number of reasonable strategies pursued, and the responses necessitated by the maneuvering of the other side." *Id.* It is also appropriate to consider the duplication of services. *Id.* In making this determination, it is not necessary for a district court to "identify and justify each disallowed hour," or to specify "what hours are permitted for each legal task." *Mares,* 801 F.2d at 1202.

USE/CC critiques Phelps Dodge's number of hours billed in several ways. USE/CC contends that the "sheer magnitude" of Phelps Dodge's request is "sufficient evidence" of the unreasonableness of its fees. USE/CC states that Phelps Dodge's use of 16 lawyers and 13 paralegals and clerks for a lawsuit USE/CC characterize as "interpreting a single contract provision" is presumptively unreasonable.  While Phelps Dodge bears the burden of justifying the number of hours expended, USE/CC's description of this lawsuit as a simple contract dispute is hard to swallow. USE/CC initially filed 20 counter-claims and third party claims and 28 affirmative defenses. This case involved several motions for summary judgment and motions in limine. Caschette stated at the hearing that the case, in addition to being complex, was "contentious."  An earlier Order in this case, dated July 28, 2004, stated explicitly: "This is a complex case involving contract, tort and property-law questions under Colorado law;

corporations questions under Colorado, New York and Delaware law; and federal antitrust and environmental-law questions." USE/CC's effort to downplay the complexity of this case simply lacks credibility.

At the hearing, Kauffman and Pohlman testified that in light of the complexity of this case, the number of lawyers and the number of hours expended were reasonable. Caschette also concurred that for a case of this magnitude, the amount of lawyer time and effort devoted to the case was reasonable. Reviewing the detailed legal bills and invoices in this case, and in light of the complexity of this case, I do not find that the work of the Phelps-Dodge attorneys reflect unreasonable legal staffing.

C.      Inappropriate Charges

USE/CC, in their briefs, identified several areas where fees were improperly charged to this litigation. Phelps Dodge now concedes these mis-charges, and at the hearing agreed to reduce its $3,339,949.05 fee by $62,303.47. These mis-charges include an improper fee for immigration work not related to this case, fees and expenses incurred preparing the MEP for transfer, (which was a Phelps Dodge contractual obligation and is thus not appropriately charged here), charges for time spent by Phelps Dodge expert witness Dr. Alan Madian on anti-trust claims, (which were dismissed with a stipulation that parties bear their own costs), and time spent negotiating the purchase of a computer software license, which USE/CC claims is an overhead expense not appropriately charged here.

Phelps Dodge, in the face of questioning by USE/CC at the hearing, also acknowledged additional charges that were inappropriate and should not be billed. These total $907.

USE/CC also contends that Phelps Dodge seeks excessive and inappropriate fees for

Madian. USE/CC argues that Phelps Dodge let Madian "run wild" by allowing him to visit the

Mt. Emmons site, the Henderson mine and Ft. Madison Indiana, all of which were unnecessary to

his report. Phelps Dodge retained Madian, an economist, to address USE/CC's common law

claims and assessment of damages. USE/CC had claimed that Phelps Dodge failed to

appropriately develop the mining operation and had improperly located the WTP at the mining

operation. Madian was retained to provide  "an independent assessment of . . . the economic

validity and value, if any" of USE/CC's damages claims. (Expert Report of Alan L. Madian, pages

4-5). At the hearing, Phelps Dodge explained that Madian's trips to the mining facilities were

necessary for him to become familiar with the economics of Molybdenum mining in order to

prepare his expert report and, if necessary, to face cross-examination. Under the circumstances of

this case, I do not find these trips to be unreasonable.

　　　More troubling is the overall billing for Madian. Phelps Dodge claims expert witness fees

and costs for Madian of $491,411.37, but has provided no billing records for Madian as part of

this motion. Detailed bills for Madian are part of the record of this case as Joint Trial Exhibit 211,

and show $438,017.77 in fees and expenses. This is about $53,000 short of the amount Phelps

Dodge claims in this motion. Phelps Dodge made numerous efforts at the hearing to explain this

discrepancy, none of them persuasive. In the absence of any documentation or justification for

these expenses, Phelps Dodge's request for costs will be reduced by $53,393.60.

　　　USE/CC argues that the request for fees and costs includes charges that are part of law

firm overhead, and thus not properly part of the fees chargeable to USE/CC. In addition to the

charges USE/CC identified at the Hearing, I have reviewed the invoices and found additional

examples of inappropriate overhead. On Invoice # 77888 attached to the Pohlman affidavit, in a

charge dated September 23, 2003, Lisa Von Bockern billed $24 for researching Tenth Circuit

rules for citing to unpublished opinions. This kind of general research, of use to other clients and

not specific to this case, is more properly considered overhead, and should not be billed here.

Also, on Invoice 39519 attached to the Nazarenus affidavit, in a charge dated May 12, 2003,

Patricia Davis bills some unclear number of hours to researching and setting up a WebEx

Conference capability.  Establishing a web-based conferencing infrastructure, usable for other

clients once established, is firm overhead. Since I cannot ascertain precisely how many hours

Davis devoted to this task, I will assume two hours at $125/hour, or $250. On invoice 38528

attached to the Nazarenus affidavit, Richard Kaufman on March 12, 2003 charges $23.50 for

"Telephone call to Cindy Chandley concerning personnel changes."  A law firm's internal

personnel management issues are not appropriately billed to the losing party.  I deduct these

charges, totalling $297.50, from Phelps Dodge's total claims.

      Finally, USE/CC contends that some of the legal costs Phelps Dodge claims relate to the

operation of the Properties and so are not recoverable as attorney fees. USE/CC repeats its

argument that they are not liable for these costs because Phelps Dodge did not tender the quit

claim deed. Since, as discussed above, I reject this argument as a basis for denying the operational

costs of the Properties, I also reject it as a basis for denying attorney fees.

      USE/CC also suggests that Phelps Dodge will recover twice for some of the MEP

operational costs since it is claiming these costs simultaneously as attorney fees and as MEP

operating expenses. USE/CC pointed out correctly that some of the legal costs are marked on the

invoices as "operational." Moreover, the Pohlman affidavit states that $36,032.11 in legal fees

billed includes "fees attributable to operational issues at Mt. Emmons."

At the Hearing, Phelps Dodge provided a spreadsheet of costs and expenses for the MEP, presented as Exhibit 11. According to the testimony of Kevin Knoll, Comptroller of the Mt. Emmons Property, the MEP accounts for legal costs and other professional expenses as a separate line item. In calculating MEP Operating expenses, Phelps Dodge deducted all of its legal costs in this case, including those for the non-recoverable anti-trust claims, from the total operating expenses of the MEP. The total operating expenses it claims for the MEP thus already excludes all legal costs related to this litigation, recoverable or not. Accordingly, if the legal fees marked as "operational" are counted as legal fees, they are not counted as operating expenses.

The operating expenses Phelps Dodge claims are the total expenses listed in Exhibit 11 for July 2002 through August 2005, $8,616,228.42, minus all of the legal costs in this case, including anti-trust costs, $4,300,934.97. This equals $4,315,293.45. All adjustments from legal fees in this Order are from the total of non anti-trust fees, $3,339,949.05, and do not impact the figure for MEP operating expenses. For these reasons, I conclude that allowing Phelps Dodge to recover legal fees marked on their invoices as for "operations" is not a double recovery.

Based on all of the reductions outlined above, I reduce Phelps Dodge total award by $116,901.57.

E.       Discovery and Jury Trial

A hearing on attorney fees and costs was held on this issue on July 20, 2006. USE/CC asserts that it is entitled not only to this hearing, but also to discovery and to a jury trial. However, as discussed above, I consider this motion for attorney fees as a request for further relief under § 2202, following an action for Declaratory Judgment under § 2201. In that action, USE/CC waived its jury trial rights. This waiver extends to this action for damages.  It is unclear

19

from USE/CC's brief if it is requesting a jury trial and discovery under § 2202, or merely notice and hearing. At any rate, it has received notice and a Hearing, and it is not entitled to a jury trial or discovery.

Therefore, it is so ORDERED that Phelps Dodge's Amended and Restated Motion for Attorney fees (Docket # 365) is Granted, in that:

1) As further relief under 28 U.S.C. § 2202, it is declared that USE/CC has engaged in an anticipatory breach of the 1987 Agreements by refusing to accept the ownership and operational responsibility of the Water Treatment Plant as part of the transfer of the Mt. Emmons Properties;

2) This breach caused Phelps Dodge to incur attorney fees and costs; and operating expenses for the Mt. Emmons Properties;

3) Phelps Dodge is therefore awarded attorney fees and costs of $3,223,047.48; operational expenses for the Mt. Emmons Properties of $4,315,293.45; and

4) Judgment shall be entered accordingly.

**DONE and ORDERED,** this ___25th___ day of July, 2006 at Denver, Colorado.

___s/Lewis T. Babcock_____
United States District Chief Judge

20